IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VALENCIA HARPER            :       CIVIL ACTION
                               :
      v.                 :
                               :
TYCO ELECTRONICS CORPORATION  :      NO. 11-01

MEMORANDUM

Bartle, C.J.                                      April 12, 2011

      Valencia Harper, proceeding pro se, filed this action against Tyco Electronics Corporation ("Tyco") in which she alleges that because of her race she was subjected to a hostile work environment, disparate treatment, and a constructive discharge in violation of 42 U.S.C. § 2000e.  Before the court is the motion of Tyco to dismiss the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failing to state a claim upon which relief can be granted.

I.

      When deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court accepts as true all factual allegations in the pleading and draws all inferences in the light most favorable to the nonmoving party.  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).  We then determine whether the pleading at issue "contain[s] sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"  Ashcroft v. Iqbal, --- U.S. ----, ----, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atl. Corp.

v. Twombly, 550 U.S. 544, 570 (2007)).  A claim must do more than raise a "'mere possibility of misconduct.'"  Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Iqbal, 129 S. Ct. at 1950).  In deciding a motion to dismiss under Rule 12(b)(6), the court may consider "an undisputedly authentic" document upon which a party explicitly relies in pleading its claims, whether or not the document is attached to the challenged pleading.  In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1425-26 (3d Cir. 1997) (quoting In re Donald J. Trump Casinos Sec. Litig., 7 F.3d 357, 368 (3d Cir. 1993)).

In reviewing Harper's complaint, we are mindful that a pleading "filed pro se is to be liberally construed, and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."  Erickson v. Pardus, 551 U.S. 89, 94 (2007) (internal quotations and citations omitted).  Nevertheless, a pro se litigant's complaint must still state a plausible claim.  Thakar v. Tan, 372 Fed. App'x 325, 328 (3d Cir. 2010).

## II.

The following facts are viewed in the light most favorable to Harper, the non-moving party.

Tyco hired Harper to assist Tyco's attorneys in preparing filings related to patent applications Tyco was prosecuting.  Harper applied and interviewed for a position as a paralegal but learned after she was hired that her official title would be "patent specialist."  Tyco's human resources department

explained to Harper that she could not have the title of paralegal because only employees with a paralegal certificate could be classified in this way.  At the time she was hired, Harper had a bachelor of arts degree unrelated to law or paralegal studies.  According to the complaint, the other Tyco employees in the same department as Harper who had the title of paralegal possessed either an associate's degree in paralegal studies or a paralegal certificate.  Of the twelve people working in that department, ten were white, one was Hispanic, and one, Harper, was black.[1]

Harper was assigned to support the work of white attorney Helen Wolstoncroft.  Wolstoncroft had duties related to prosecuting Tyco's patent applications.  The complaint alleges that Harper was personally responsible for ensuring that Tyco met prosecution deadlines.  The overarching theme of Harper's complaint is that Wolstoncroft's dilatory conduct and work habits frustrated Harper's ability to perform her duties.

The exact source of Harper's tension with Wolstoncroft is unclear, but Harper repeatedly characterizes Wolstoncroft's treatment as "hostile."  Harper alleges that Wolstoncroft ignored Harper's email requests to communicate in person about particular assignments rather than by email or in writing.  Harper suggests that Wolstoncroft's written directions were difficult to follow.

---

1.  In her complaint, Harper identifies herself as "black," but in her brief opposing Tyco's motion to dismiss, she refers to herself as both "black" and "African-American."  Following Harper's complaint, we will refer to her as "black."

Wolstoncroft also ignored Harper's emails concerning files that became lost in Wolstoncroft's office. Harper avers she "spent several hours every day looking for files and wasting time trying to resolve business demands which required the attention of Helen Wolstoncroft." While Wolstoncroft allowed Harper to search Wolstoncroft's office for the files, Wolstoncroft's "hostile body language, actions and gestures created unpleasant working conditions" during those searches. In February 2008, an electronic document Harper needed was purportedly "sabotaged" because an unknown person deleted a portion of the text. The complaint implies Wolstoncroft was the saboteur. Harper alleges that her interactions with Wolstoncroft became so challenging that on May 22, 2008, Harper suffered a panic attack in the office and subsequently missed five days of work.

Harper's attempts to involve Tyco management in resolving her differences with Wolstoncroft were unsuccessful. In December 2007, Harper discussed these problems in a meeting with Tyco vice president Driscoll Nina and Harper's direct supervisor, Marie Brown, who are both white. The exact grievances Harper raised in the December 2007 meeting are not stated. According to the complaint, however, Nina responded to Harper by saying that Wolstoncroft "is under a lot of stress, Valencia everyone likes you." Nina allegedly responded to Harper's complaints with a dismissive attitude and body language.

Then, in May 2008, following Harper's panic attack, Nina suggested Harper consult with human resources manager Angela

Mosley. Anita Auten, a white paralegal, told Harper that
Mosley's involvement meant that Tyco's management is "not going
to do anything about how you have been treated. They are
basically just waiting for you to move on." The source of
Auten's authority on the subject is not set forth.

Mosley conducted an investigation of Harper's
grievances. As part of that investigation, Mosley met with
Harper on May 30, 2008 and interviewed several Tyco attorneys,
including Wolstoncroft, on June 9, 2008. On June 9, Mosley
failed to meet with Harper, even though Mosley had told Harper by
email three days earlier that the two could meet after Mosley
concluded the interviews. During the investigation, Mosley
ignored several emails and a phone call from Harper. Tyco
allowed Harper to continue working for Wolstoncroft while Mosley
investigated Wolstoncroft's conduct.

Harper is purportedly not the first Tyco employee to
struggle in working for Wolstoncroft. Two of Harper's white co-
workers, Anita Auten and Paula Capriglione, had previously
complained to Nina about working as paralegals under
Wolstoncroft. Harper alleges that following Capriglione's
complaints to Nina, Tyco responded by reassigning Capriglione to
support different attorneys. In fact, the complaint alleges that
Tyco hired Harper specifically to facilitate Capriglione's
reassignment. Harper alleges that when Auten experienced
difficulties working for Wolstoncroft, Nina spoke to Wolstoncroft
on Auten's behalf. After Nina addressed Auten's concerns with

Wolstoncroft, Wolstoncroft's treatment of Auten and their working relationship improved.

On June 30, Mosley responded to Harper's resignation by email. In the email, Mosley identified the five ways in which Harper had previously reported being mistreated by Wolstoncroft. These are: "[Wolstoncroft] [d]oesn't like you; Is very curt with you, which makes you feel uncomfortable about approaching her to ask questions; Avoids you and interferes with your work flow by writing notes to you with unclear instructions rather than talking to you; Ignores your emails that you send to her about business related matters; and Deliberately puts up roadblocks in order to keep you from succeeding." Mosley states that her (Mosley's) investigation revealed that Harper had "misperceived [Wolstoncroft]'s actions."

Harper replied to Mosley's email on July 1. In the July 1 email to Mosley, Harper asserts that Mosley failed properly to investigate Harper's allegations by neglecting to interview Auten or Capriglione. Harper's July 1 email to Mosley reiterates that Tyco's failure to take any action with regard to her complaints forced Harper's resignation.

On July 1, Harper forwarded a copy of her resignation letter and Mosley's June 30 email to Tyco's CEO. In this email, Harper states that the five bullet points in Mosley's June 30 email, quoted above, "<u>clearly</u> define hostile working conditions."

Harper's complaint contains three counts. Count I asserts that Harper was subject to disparate treatment because of her race. In this count, Harper alleges that Tyco responded more favorably to Auten and Capriglione when they complained about poor treatment by Wolstoncroft. Reading Count II liberally, Harper alleges that both Wolstoncroft's treatment and Tyco's response to that treatment created a hostile work environment. Finally, Count III alleges that Tyco constructively discharged Harper by failing to remedy Wolstoncroft's hostile conduct.

III.

Count III of the complaint alleges that Tyco constructively discharged Harper by failing to address the hostile conditions Harper experienced while working for Wolstoncroft. Harper alleges in her complaint that this is a violation of Title VII, 42 U.S.C. § 2000e-2, but argues in her brief opposing Tyco's motion to dismiss that it is a violation of 42 U.S.C. § 1981. Although the legal basis of Count III is unclear, actions under § 1981 and Title VII typically involve identical elements and analysis. <u>Brown v. J. Kaz, Inc.</u>, 581 F.3d 175, 181-82 (3d Cir. 2009).

Tyco asserts that no independent cause of action for "constructive discharge" exists under either Title VII or § 1981

-7-

in an at-will employment context.  Harper has not cited and the court has not found any case suggesting that "constructive discharge" is a distinct cause of action under either statute. The Supreme Court has recognized, however, that under Title VII an employee may bring a "hostile-environment constructive discharge claim."  Ps. State Police v. Suders, 542 U.S. 129, 147 (2004).  This is "an aggravated case" of a hostile work environment claim in which the plaintiff must prove that her working conditions have become "so intolerable that a reasonable person would have felt compelled to resign."  Because Harper is proceeding pro se, the court will construe Count III's allegation of constructive discharge as an extension of Count II, in which Harper avers she experienced a racially hostile work environment.

Federal law prohibits employers from requiring employees to work in a "discriminatorily hostile or abusive environment."  Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002); see 42 U.S.C. § 2000e-2(a)(1) (2006).  To establish a prima facie case of racial discrimination based on a hostile work environment, a plaintiff must prove that:  (1) she suffered intentional discrimination because of her race; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) the discrimination would negatively affect a reasonable person in the her position; and (5) respondeat superior liability exists.  Jensen v. Potter, 435 F.3d 444, 449 & n.3 (3d Cir. 2006); Andrews v. City of Phila., 895 F.2d 1469, 1482 (3d Cir. 1990).

To plead the first element of a hostile work environment claim, a plaintiff must allege facts plausibly showing that the mistreatment she experienced at her job arose from racial animus. In Davis v. City of Newark, our Court of Appeals upheld dismissal of a racially hostile work environment claim where the plaintiff's allegations of mistreatment by her employer and co-workers were not clearly motivated by racial discrimination. 285 Fed. App'x 899, 901-02 (3d Cir. 2008). The court noted that allegations in a complaint "that cannot be reasonably construed as invoking any racial feeling do not support Title VII liability." Id. In a similar case, the plaintiff alleged her supervisor undermined her authority with subordinates, conspired with others to ensure the plaintiff received a poor review, called the plaintiff names, and caused other employees to ostracize the plaintiff. Jackson v. Locke, Case No. 10-705, 2011 WL 1231301, at *7-*8 (D. Md. Mar. 29, 2011). The district court dismissed the employee's discrimination and hostile work environment claims because none of her allegations of mistreatment was in anyway connected to her race. Id.; see also Sykes v. Pa. State Police, 311 Fed. App'x 526, 528-29 (3d Cir. 2008); Barber v. Univ. of Med. and Dentistry of N.J., 118 Fed. App'x 588, 591 (3d Cir. 2004).

The first hostile work environment theory in Harper's complaint concerns Wolstoncroft's conduct. The complaint alleges that Wolstoncroft treated Harper so poorly that (as alleged in Count III) Harper was forced to resign. Wolstoncroft allegedly

-9-

disliked Harper, treated Harper curtly, avoided Harper and interfered with Harper's ability to perform her job, left written instructions for Harper despite Harper's preference for in-person discussion, ignored emails, and "put[] up roadblocks in order to keep [Harper] from succeeding."

Despite the many factual allegations in the complaint, Harper fails to plead any facts establishing a nexus between Wolstoncroft's conduct and Harper's race.  In fact, Harper alleges that white paralegals working for Wolstoncroft experienced similar difficulties that also required intervention by Tyco's management.  Further, Harper criticized Mosley's failure to interview these white paralegals while investigating Harper's experience working under Wolstoncroft.  None of Harper's allegations plausibly suggests "race [was] a substantial factor in the harassment, and that if the plaintiff had been white she would not have been treated in the same manner."  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1083 (3d Cir. 1996).

Harper also alleges in Counts II (and III) that Tyco's failure to intervene between Harper and Wolstoncroft created a hostile work environment.  As noted above, Harper has failed to allege that Wolstoncroft's conduct created a racially hostile work environment.  Similarly, Harper alleges no facts that plausibly suggest that Tyco's failure to take action caused or contributed to a racially hostile work environment.  Harper's allegations are simply inconsistent with the existence of such an environment at Tyco.

Accordingly, the court will dismiss Counts II and III of the complaint.

V.

Count I of the complaint alleges that Tyco subjected Harper to disparate treatment because of her race.  Harper alleges that because she is black, Tyco forced her to continue working for Wolstoncroft when it had previously allowed another white employee working for Wolstoncroft to transfer to another position.  Harper also alleges that Tyco treated her differently because Tyco managers provided more assistance to temper Wolstoncroft's conduct when that conduct affected a white paralegal.

Tyco argues Count I should be dismissed because Harper has failed to allege that Tyco took an adverse employment action against her and thus has failed to state a prima facie case.  The elements of a prima facie Title VII case are not "one-size-fits-all," but vary "depend[ing] on the facts of a particular case." Jones v. Sch. Dist. of Phila., 198 F.3d 403, 411 (3d Cir. 1999). Thus, some cases have explicitly listed an "adverse employment action" as an element of the prima facie case in addition to the other elements:  membership in a protected class and qualification for the relevant employment.  See Johnson v. St. Luke's Hosp., 307 Fed. App'x 670, 671-72 (3d Cir. 2009).  Other cases do not rely on the phrase "adverse employment action, requiring only that "nonmembers of the [protected] class were treated more favorably" than the plaintiff.  Goosby v. Johnson &

-11-

Johnson Med., Inc., 228 F.3d 313, 318-19 (3d Cir. 2000); see

Miller v. Del. Probation & Parole, 41 Fed. App'x 581, 583 (3d

Cir. 2002).  Whether called an "adverse employment action" or

"less favorable treatment," Harper's burden at this stage is the

same:  She must allege facts that plausibly "create an inference

that an employment decision was based on a discriminatory

criterion illegal under" Title VII.  Int'l Bhd. of Teamsters v.

United States, 431 U.S. 324, 358 (1977).

        Harper has done so here.  Harper, a member of a

protected racial class, alleges that two similarly-situated white

paralegals received more favorable treatment from Tyco when they

experienced difficulty working with Wolstoncroft.  Specifically,

Tyco vice president Driscoll Nina spoke to Wolstoncroft about her

treatment of Auten, which allegedly improved the working

relationship between Auten and Wolstoncroft.  Tyco also

transferred Capriglione away from Wolstoncroft and even hired

someone new, Harper, to facilitate the transfer.  Harper

experienced the same difficulties that white employees had

encountered with Wolstoncroft.  However, in contrast to the white

employees' experience, Tyco not only failed to provide assistance

to Harper, but also concluded that Harper was "misperceiv[ing]"

Wolstoncroft's actions.  Thus, in the light most favorable to

Harper, the allegations in the complaint plausibly allege that

Tyco treated Harper less favorably because of her race in

violation of Title VII.

Tyco's motion to dismiss Count I of the complaint will be denied.